# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### April 1, 2014 Session

## STATE OF TENNESSEE v. KEITH COLLINS

**Direct Appeal from the Criminal Court for Shelby County**
**No. 11-05218      James C. Beasley, Jr., Judge**

———————————

**No. W2013-01119-CCA-R3-CD  - Filed July 14, 2014**

———————————

A Shelby County Criminal Court Jury convicted the appellant, Keith Collins, of conspiracy to possess with intent to sell more than 300 grams of cocaine, a Class A felony, and attempt to possess more than 300 grams of cocaine with intent to sell, a Class B felony. After a sentencing hearing, the trial court sentenced him as a Range II, multiple offender to consecutive sentences of forty and twenty years, respectively. On appeal, the appellant contends that (1) the trial court should have given an accomplice instruction with regard to one of the State's witnesses; (2) the evidence is insufficient to support the convictions; (3) the trial court improperly allowed a State witness to testify about a bad act pursuant to 404(b), Tennessee Rules of Evidence; (4) he is entitled to a new trial based on a witness's false testimony; and (5) consecutive sentencing was improper. Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JERRY L. SMITH and D. KELLY THOMAS, JR., JJ., joined.

James E. Thomas (on appeal) and Rhonda D. Hooks and Michael Harris (at trial), Memphis, Tennessee, for the appellant, Keith Collins.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Ray Lepone and Paul Hagerman, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

In July 2011, the Shelby County Grand Jury indicted the appellant and Mario Leavy for second degree murder in the death of Quarterus Simmons, aggravated arson, conspiracy to possess with intent to sell more than 300 grams of cocaine, attempt to possess more than 300 grams of cocaine with intent to sell, and employing a firearm during the commission of a dangerous felony. The appellant was tried separately from his codefendant.

At trial, nineteen-year-old Daijenae Cummings testified that on December 19, 2008, she lived in the Essex House Apartments in the Whitehaven area of Memphis and was at home babysitting her younger brother and sister. That afternoon, Cummings was sitting at the computer in her living room when, "out of nowhere," she heard a loud noise that sounded like a firecracker. She said that the computer screen "went out" and that she heard three to five additional "bang[s]." Cummings checked the computer cords and began smelling gunpowder. She moved some of the cords and saw a bullet, which had come through the wall, on the floor. Shortly thereafter, the apartment manager knocked on the front door and told everyone in the apartment to get out. Cummings went outside and saw that the apartment building was on fire and that smoke was coming out of the apartment next door. She said she had seen a group of men "hanging outside that door just one time but nothing before or after." Cummings said she had thought the apartment was vacant and was surprised to learn someone lived there.

On cross-examination, Cummings testified that prior to the gunshots, she heard male voices through the wall but did not hear shouting, arguing, or banging against the wall. Defense counsel pointed out the appellant to Cummings, and Cummings said she had never seen him before trial.

Officer Mario Tate of the Memphis Police Department (MPD) acknowledged that on December 19, 2008, he responded to a call about 1:40 p.m. He said that the initial report was "shots fired" and that he and another officer went to the Essex House Apartments. When they arrived, a two-story apartment building was on fire. Firemen were present and trying to get into a second-story apartment, but something was blocking the apartment door. When the firemen got inside, they yelled down to the officers that a body was on the floor.

Claiborne Jefferson testified that in December 2008, he worked in maintenance at the Essex House Apartments and that Stephanie Strong was the apartment manager. Jefferson acknowledged that he knew a man by the name of "Goldie" and that Goldie lived in the apartment where the shooting occurred on December 19. Jefferson said that Antonio "Tony" Moore lived in the apartment prior to Goldie and that "the next thing I knew [Moore] wasn't there and Goldie was there." Jefferson acknowledged that Goldie was not paying rent as were the families living in the apartment complex and that "there was something sort of on

the side having to do with Goldie." Jefferson stated, "At first I thought it was just a place where, you know, come back from the club, take females, then later on [I] found out it was dealing with drugs." Strong also was aware of the situation regarding Goldie's apartment. On December 19, Jefferson had the day off but received a telephone call from Strong. He said Strong sounded "panicky" and told him about the shooting and fire, so he went to the apartment complex. Later that day, Jefferson spoke with Moore, but Moore claimed he did not know anything about the incident.

On cross-examination, Jefferson acknowledged giving a statement to police on December 20, 2008, and telling an officer that people in a green Toyota Camry or green Saturn frequented the apartment. On one occasion, Jefferson saw an African-American male, an African-American female, and a child in the car. One or two days before the shooting, he saw two African-American males in the car. Jefferson said that one of the males had a lighter complexion and that the other male had "twist dreads" that extended just below his shoulders. He said that he gave Moore and Goldie the key to the apartment but that Strong gave him permission to do so. Moore and Goldie had been occupying the apartment for a month or less prior to December 19. Jefferson acknowledged that Strong gave him money as part of his "cut" for allowing Moore and Goldie to stay in the apartment and that a mother with three children lived in the apartment next door.

Barbara Simmons, Quarterus Simmons's mother, testified that in December 2008, he lived with her most of the time. However, he also stayed with "female friends" and "over there in the apartments." Ms. Simmons said she knew her son smoked marijuana but "didn't know nothing else as far as [drugs]." On December 19, Ms. Simmons was watching the news on television and learned about an apartment fire and shooting. She telephoned Quarterus,[1] but he did not answer. Later, another son called her and told her Quarterus was dead. Ms. Simmons said that she had spoken with Quarterus the night before the shooting and that he always called her when he was going to spend the night out. She acknowledged that she knew someone by the name of Tony and that she met Tony through Quarterus. She said that Quarterus knew Tony "[t]oo long" and that he met Tony at least three years before his death. Ms. Simmons said Quarterus's "associates" called him "Goldie."

Antonio "Tony" Moore acknowledged that he was a drug dealer and had a prior conviction for selling cocaine. Moore said that he and Quarterus Simmons were friends, that they were involved in dealing cocaine together, and that Simmons worked for him. Moore would set up the deals and give the cocaine to Simmons for delivery. Moore said he also conducted drug deals with Mario Leavy, who was the cousin of Moore's wife, and that he

---

[1]Because Ms. Simmons and Quarterus Simmons share a surname, we will briefly refer to him by his first name for clarity.

and Leavy "did quite a few deals." Moore did not know the appellant.

Moore testified that he began dealing drugs out of apartment 6 at the Essex House Apartments about "a week or so" before the shooting. Moore paid Stephanie Strong, whom he met through Claiborne Jefferson, "under the table," and she allowed him to use the apartment without a lease. Moore said he did not know that a sixteen-year-old with two siblings lived in the apartment next door.

Moore testified that on the morning of December 19, 2008, he received a telephone call from Leavy. Leavy asked Moore to "hook him up," and Moore agreed to sell Leavy 500 grams of cocaine for $18,000. Moore told Leavy that "Goldie will let you in and I'll be there." Leavy told Moore that someone named "Lotto" would be with him but did not mention anyone else. After speaking with Leavy, Moore talked with Simmons and told him to let Leavy into the apartment. Moore said that Leavy was supposed to wait in the apartment with Simmons and that Moore was going to bring the cocaine. Moore said Simmons would have had a gun.

Moore testified that while he was driving to the apartment, he was delayed by traffic. Leavy telephoned him and told him that the apartments were on fire, that police were everywhere, and that "they had to leave." Leavy wanted Moore to meet him in North Memphis. Moore telephoned Simmons to find out what was going on, but Simmons did not answer, so Moore drove to the Essex House Apartments. He saw ambulances and police, and Jefferson told him what had happened and that Simmons was dead. Moore never went to North Memphis to meet Leavy, and he sold the cocaine to someone else.

Moore testified that he spoke with the police on December 20, 2008, and that he did not tell them about the cocaine. Instead, he told them that the drug deal involved marijuana and that Simmons set up the deal. Moore said he lied to the police because he did not want them in his business and did not want to expose himself. However, he told them about Leavy's involvement. Moore identified 503-xxxx as the number for his cellular telephone; 314-xxxx as Leavy's number; and 643-xxxx as Simmons's number. He said he had not talked with Leavy since the day of the shooting. Moore acknowledged that the State agreed not to prosecute him for possessing the 500 grams of cocaine in exchange for his testifying truthfully against the appellant. He also acknowledged that Simmons was dead due to the drug deal he set up.

On cross-examination, Moore testified that he did not know the appellant but had known Leavy since 2004. At the time of the shooting, Moore drove a white 2004 Cadillac. He said that Leavy drove a green Saturn and that Leavy and Leavy's girlfriend had a baby. However, Moore had to give Leavy directions to the apartment on December 19 and had

-4-

never seen the Saturn there. Simmons also knew Leavy but had never seen Leavy at the apartment. Moore and Simmons had been using the apartment two weeks or less at the time of the shooting. Moore said he was at the apartment "quite a few times" but not on the day of Simmons's death.

Officer Jeffrey Garey of the MPD went to the crime scene on December 19, 2008, to collect evidence. When he arrived, other officers also were present, and the fire department was there "in force." The apartment in question, apartment 6, was upstairs. Officer Garey said that "burnt wood particles" and broken glass were in the area in front of the apartment and that he entered the apartment through the living room window. He saw extensive fire damage in the corner next to the window and Simmons's body in the kitchen. The body had "burn damage," and bottles of soda, beer, and dishwashing liquid were on the kitchen counter. Simmons's cellular telephone was on his person, and Officer Garey did not see anything in his hands. In the living room, Officer Garey found a forty-five-caliber bullet casing. The casing was "slightly behind" a television and in the burned area of the room. On the opposite side of the living room, he saw a bullet hole in the wall. The hole was behind a chair and in the lower portion of the wall, and the hole appeared to extend into the apartment next door. Officer Garey went next door and retrieved the bullet.

Officer Garey testified that two folding metal chairs were in the living room of apartment 6. The apartment had one bedroom, and Simmons's identification and personal items were in the room. Officer Garey acknowledged that he did not find the appellant's wallet, identification, fingerprints, or DNA in the apartment. He collected numerous items to test for fingerprints, including a two-liter 7UP bottle with "ridge detail," but no prints were obtained.

Dr. Miguel Laboy testified as an expert in forensic pathology that he performed Simmons's autopsy. Simmons was five feet, nine inches tall; weighed 206 pounds; and had dreadlocks about fourteen inches in length. He was wearing a white sleeveless shirt, blue denim pants, and boxer underwear, and the clothing was partially burned. A partially-burned cellular telephone and a multi-colored blanket were received with the body.

Dr. Laboy testified that Simmons had four gunshot wounds. One bullet entered the left side of Simmons's head and fragmented into two parts. One part exited the left side of his head, and the second part perforated his brain and exited the right side of his nose. No part of the bullet was recovered. A second bullet entered the back of Simmons's neck, lacerated the common carotid artery of the heart and upper lobe of the right lung, and fractured one rib. Dr. Laboy recovered the bullet from the soft tissue of Simmons's right chest, and the bullet was a medium-caliber jacketed bullet. He described the gunshot wound as one of "loose contact," meaning the gun was close to, but not touching, the skin when the

gun fired. Dr. Laboy saw soot and gunpowder particles around the wound. He described the head wound as one of "intermediate range," meaning the muzzle of the gun was farther away but still close enough for gunpowder particles to abrade the skin. A third bullet entered Simmons's right flank, perforated his liver, and fractured a rib. Dr. Laboy recovered the bullet from Simmons's left nipple area, and the bullet was a large-caliber jacketed bullet. Dr. Laboy saw a "defect" on Simmons's clothing caused by the gunshot but did not see any soot or stippling. Therefore, he classified the wound as one of indeterminate range, meaning the gun was too far away for the gunpowder particles to impact the area. A fourth bullet entered Simmons's right buttock and exited "right in more to the center of the person and lower." Dr. Laboy did not recover the bullet, and the wound also was of indeterminate range.

Dr. Laboy testified that Simmons had chemically-induced burns to his torso and extremities. The skin on his left chest, left abdomen, left flank, and buttocks was burned, and most of his lower left extremity was charred. He had multiple linear abrasions, i.e., scrapes, on the back of his left forearm, an abrasion on the side of his right shoulder, an abrasion on the side of his right arm, and an abrasion on the left side of his middle back. Dr. Laboy tested Simmons's blood for carbon monoxide to determine if he was alive at the time of the fire. Based on the result, Dr. Laboy concluded that Simmons could have been breathing when the fire started. Simmons's toxicology tests were positive for marijuana and cocaine. Dr. Laboy stated that Simmons's cause of death was multiple gunshot wounds and that the manner of death was homicide.

Forty-six-year-old Janice Williams testified that she had three children, ages thirteen, fifteen, and twenty-seven, and that she met the appellant in 2006. At the time of Simmons's death, Williams was the appellant's girlfriend, and they were living in Williams's home in Southaven, Mississippi, with her two youngest children. Williams said that on December 19, 2008, she telephoned the appellant. He told her he was "taking care of some business" and would call her back. Williams worked at Milwaukee Electric Tool, but the appellant was unemployed, and she did not talk to him again until she got home that night. She said that the appellant was "just pacing the floor and looking out the window," that he was acting "kind of edgy," and that he told her to "turn the news on." The appellant and Williams saw a story about a murder in the Essex House Apartments. After the story, the appellant texted "Lotto," one of his friends. Williams said that the appellant also spoke with Lotto on the telephone and that they talked about "getting rid of the guns or something." Williams heard the appellant talk with Lotto about "Burner." Williams said that Burner was "Mario" and that the appellant and Mario "hung out" together.

Williams testified that after the appellant spoke with Lotto, she asked him what was going on. He told her that earlier that day, a "drug deal had went bad." He also told her that he and some other people were "supposed to be . . . robbing some guy. It was four of them

-6-

together and they were supposed to be robbing some guy and splitting a key." Williams acknowledged that a "key" meant a kilogram of cocaine. Williams said the appellant told her that he and the other men went to an apartment and that "Jo-Jo," whom Williams did not know, and "the other guy they got to wrestling over a gun, the guy that they met." The appellant told Mario to shoot "the guy," but Mario was too scared. Williams said the appellant claimed he "took some kind of bottle of solution and poured it on the guy's hands trying to get him off of Jo-Jo because he had Jo-Jo by the hair." The appellant then "wound up shooting him," and Mario "shot him in the butt after the fact." After the shooting, the appellant "wiped everything down" to get rid of fingerprints and "set . . . the place on fire." The appellant told Williams that they gave the guns to Mario and that Mario got rid of the guns. Williams said she did not know anything about the man who was killed.

Williams acknowledged that on February 16, 2009, she told her sister that she had been the victim of a domestic assault by the appellant, that her sister reported the incident to the Mississippi police, and that the police came to Williams's home to investigate. They also asked her about Simmons's death, and Williams wrote a statement in which she revealed what the appellant had told her. Williams and the appellant reconciled, and she did not tell him that she had spoken with the police. On August 3, 2009, Williams went to the Memphis Police Department to pick up some property for the appellant. While she was there, the police asked her about Simmons's death, and Williams told them what she had told the Mississippi police six months earlier.

Williams acknowledged that two weeks before the appellant's trial, he telephoned her from jail and told her to tell the prosecutors that she did not remember his confessing the shooting to her. The State played the recorded call for the jury. During the call, Williams told the appellant that she was "headed downtown." The appellant told her that she was not required to speak with the prosecutors and that when she got to trial, "tell the truth, if you don't remember, you don't remember." Williams also acknowledged that the appellant's cellular telephone number was 273-xxxx at the time of Simmons's death and that he had her obtain a new number for the phone the day after Simmons's death.

On cross-examination, Williams testified that in 2009, she was forty-two years old and that the appellant was "in his twenties." She drove a 2007 white Patriot. The appellant did not have a car but would rent one from time to time. He was unemployed, and Williams provided cell phones for both of them and her son. The appellant's telephone service provider was Cricket, and her son's provider was T-Mobile. Williams denied that the appellant had her change his cell phone number bi-weekly. She said she remembered changing the number twice during their relationship: once after he got into an altercation with a man and the day after Simmons's death.

Williams testified that a few months after she met the appellant, he went to jail. When he got out, he did not have a place to stay, so Williams allowed him to stay at her home. She said the appellant was "locked up" again a few months later. He got out of jail in November 2008, and she allowed him to return to her home. Williams acknowledged that, at that time, she thought of the appellant as her husband.

Williams testified that after she and the appellant watched the news on December 19, he used his Cricket phone to text and call Lotto. Williams met Lotto one time after Simmons's death, and Lotto did not have dreadlocks. Williams knew Mario Leavy prior to Simmons's death, and neither Leavy nor the appellant had dreadlocks. She did not know why Leavy had the nickname "Burner." Williams did not contact the police on December 20, 2008, because the appellant cared for her children. She also did not contact them because the appellant had beaten her and put guns to her head previously. She said that "psychologically [she] was destroyed," that she was afraid of the appellant, and that she acted liked she loved him because she did not know what he was going to do. The appellant did not become violent with Williams until 2008. Despite the violence, she allowed him to return to her home when he was released from jail in November 2008. Williams asked the appellant to leave, but she never called the police to have him removed from her home. She acknowledged that despite being afraid of him, she spent Christmas 2008, New Year's 2009, and Valentine's Day 2009 with him.

Williams testified that she felt jealousy "just like every other woman" but that she was not "crazy jealous." On February 16, 2009, Williams was on the telephone with her sister when her sister heard the domestic incident between Williams and the appellant. She acknowledged that her sister did not see the incident. However, her sister heard the appellant threaten her, and that is why her sister called the police. The appellant left Williams's home before the police arrived. Williams pressed charges against him, but she and the appellant never went to court. Williams denied that the incident occurred because she found out the appellant was seeing another woman. After the incident, the appellant stayed away from Williams's home for more than a month. He contacted her "constantly" and they reconciled, but he never moved back into her home.

Williams acknowledged that she knew a woman by the name of Latoya Palmer and said that Palmer and the appellant were friends. Williams denied that she was jealous of the friendship. She said she and Palmer had a "bad relationship" because they were "going at it about other things." Williams told Palmer that Palmer and the appellant could be friends but that she did not want Palmer at her house. Williams said she did not want any of the appellant's friends at her house. Defense counsel asked Williams if she knew a woman by the name of Christal Nelson and if she telephoned Nelson "continually." At first, Williams said she did not remember the name. However, she then said that "now I know what you're

talking about." She said that Nelson kept calling and texting the appellant and that she and Nelson were "going back and forth."

Williams testified that in July 2009, the appellant was "locked up" but that she still communicated with him because she still cared for him. In August 2009, Williams went to the police department to pick up the appellant's jewelry and ended up giving the police a statement about Simmons's death. Days before Williams gave her statement, the appellant's mother and Palmer had arrived at Williams's home to get his property. Williams said the two women were "beating" on her door and screaming, so she called the police. She denied "orchestrating this whole lie" about the appellant's confession or that anyone from the State told her what to say. She acknowledged that on March 3, 2010, she spoke with the appellant on the phone while he was in jail for this case, and defense counsel played a recording of the call for Williams in order to refresh her memory. Williams denied telling the appellant that the State told her what to say about Simmons's death. She explained to the jury that she was talking to the appellant about a case involving stolen guns, not this case; that the appellant was "pressuring" her; and that she lied to the appellant because she "wanted him to get off [her] back." Williams acknowledged that the appellant did not say anything about guns during the recorded call. However, she said, "[B]ut that's what I was referring to." On redirect examination, Williams said she let the appellant think she was on his side because "everybody that has betrayed him something has happened to them."

Twenty-six-year-old Mario Leavy acknowledged that he was facing numerous charges related to the Simmons's death, including second degree murder, and that he was expecting "consideration" for his truthful testimony against the appellant. Leavy testified that he and the appellant grew up together in the same North Memphis neighborhood. He knew Antonio Moore because Moore was married to Leavy's cousin and because Moore and Leavy conducted drug deals together. Leavy said that "Lotto" was Jason Upshaw and that "Jo-Jo" was someone with the first name "Quentin." Leavy said his own nickname was "Yo" or "Yo Burna" and that he got the nickname because he "had got burnt by a female before." He said that he may have seen Quarterus Simmons "a time or two as in doing drug deals with Tony" prior to December 19, 2008, but that he did not know Simmons.

Leavy testified that on the night of December 18, 2009, he spoke with Moore about buying drugs and that Moore agreed to sell him "half a key," or 500 grams of cocaine, for $16,000. Leavy was buying the drugs with Jo-Jo and the appellant, and they were going to pay $5,000, $5,000, and $6,000, respectively. On the morning of December 19, Leavy picked up the appellant and Jo-Jo in a green Saturn. Leavy telephoned Moore, got directions to the apartment, and drove to the Essex House Apartments. Simmons was standing outside and waved them into the apartment. Leavy and Jo-Jo went inside while the appellant waited in the car. Leavy was armed with a forty-five-caliber handgun, the appellant was armed with

a nine-millimeter handgun, and Jo-Jo was unarmed.

Leavy testified that he sat in a "fold-out" chair, that Jo-Jo stood in the living room by the hallway, and that Simmons "kept pacing back and forth . . . looking back and forth" at them. Leavy did not see a gun on Simmons. Moore had the drugs but had not arrived. Leavy stated that he kept telephoning Moore and that Moore kept saying he was on his way. At some point, the appellant knocked on the door. Simmons opened the door, and the appellant greeted him. The appellant came into the apartment, and Simmons locked the door behind him and went into a back room. When Simmons returned to the living room, Leavy saw a "forty-five" hanging out of his back right pants pocket. Simmons removed the gun from his pocket. However, before he could do anything with it, Jo-Jo grabbed the weapon and began fighting over it with Simmons. Leavy said that the struggle escalated and that Simmons and Jo-Jo "end[ed] up right on" the appellant, who was standing "closer to the window where the cardboard was on the window." Leavy said the appellant "took matters in his own hand[s] and shot [Simmons] in the top of his head." Jo-Jo got the gun from Simmons, but Simmons continued to struggle with Jo-Jo and the appellant. The struggle moved into the kitchen, and the appellant shot Simmons in the neck. Leavy said that Simmons "snatched Jo-Jo's hair out of his head" and that Simmons dropped to the floor. The appellant pointed his gun at Leavy, who was standing between the kitchen and living room, and said, "[Y]ou ain't going to do nothing." Leavy said that in response to the appellant's statement, Leavy pulled out his gun, "aim[ed] low," and shot Simmons twice, "one in the buttocks and somewhere else, I'm not sure."

Leavy testified that after the shooting, the appellant went into the living room and wiped everything down. The three of them then left the apartment. Leavy said that he and Jo-Jo got into the car, but that the appellant "doubled back" and returned to the apartment. Leavy and Jo-Jo waited for the appellant and were impatient because they did not know what he was doing. About five minutes later, the appellant returned to the Saturn and threatened to kill Leavy and Leavy's family if the appellant's "name come up in anything." Leavy said that as they were pulling away, he saw the cardboard burning on the apartment window. Leavy dropped off the appellant and Jo-Jo and then went to his "baby mother's house." He said that he did not telephone Moore but that Moore called him and wanted to know where he was. Leavy told Moore that "it's hot over there" and that they could meet in North Memphis if Moore still wanted to do the drug deal. Leavy did not talk with Moore again. He said that Moore called him but that he did not answer his telephone.

Leavy testified that the police arrested him later that day. He told the police he was not involved in the shooting and did not tell them about Jo-Jo's or the appellant's involvement. Leavy acknowledged that he lied to the police. Subsequently, he approached the State about cooperating in this case. He said he decided to testify against the appellant because the

appellant was incarcerated, so he no longer had to worry about his family's safety. He said that he, Jo-Jo, and the appellant did not plan to rob or kill Simmons on December 19 and that the shooting occurred because everyone was nervous.

On cross-examination, Leavy testified that Jo-Jo had long dreadlocks, and he acknowledged that they were about the same length as Simmons's dreadlocks. Defense counsel showed Leavy a photograph of the crime scene, and he identified hair on the floor. Defense counsel also showed Leavy two close-up photographs of two metal folding chairs in the living room, but Leavy could not identify which chair he had been sitting in. However, he recognized the location of his chair in a sketch of the scene made by Officer Garey. He said that he did not think Moore would "lie on [him]" but that Moore was lying if Moore said Leavy claimed Lotto was with him on December 19. He acknowledged that he and Lotto were good friends but stated that Lotto was not present at the apartment that day.

Leavy testified that he had never been to Simmons's apartment before December 19. He acknowledged that he often drove his girlfriend's green Saturn and that they had two children, ages three and six, at the time of trial. He said that the altercation with Simmons did not involve a fist fight but was "more of just a tussle." However, he acknowledged that photographs of Simmons showed discoloration consistent with bruising on Simmons's face. He said that he did not see the fire in the apartment until "right before we pulled off" and that he did not tell Moore the apartment was on fire. Leavy said he took the appellant's statement "you ain't going to do nothing" as a threat that the appellant was going to shoot him if he did not participate in shooting Simmons. He acknowledged that he did not usually use the word "buttocks" and that he had reviewed his testimony with the State before trial.

Leavy acknowledged that Jo-Jo was "still on the run from the charges" and denied calling Jo-Jo from jail. He also denied that the mother of his children called Jo-Jo for him while he was incarcerated and said that "[s]he wouldn't even know the numbers." He denied threatening Ladarrius Woods, the roommate of the appellant's brother, at gunpoint and telling Woods to tell the appellant to "quit running his mouth about me." Leavy said he told Woods to "tell them [to] stop talking about my case, my case isn't over with." Leavy said that he did not threaten Woods with a gun but that the appellant found out about the incident and "said something about a pistol was involved" in order to get Leavy's bond revoked.

Cervinia Braswell, a special agent forensic scientist with the Tennessee Bureau of Investigation (TBI), testified as an expert in firearms identification and comparison that she compared the nine-millimeter bullet recovered from the apartment next door to the nine-millimeter bullet recovered from Simmons's right chest. The bullets had similar characteristics but insufficient individual characteristics for a more conclusive identification. However, they could have been fired from the same gun. Agent Braswell also examined a

forty-five-caliber bullet recovered from Simmons's left chest and the forty-five-caliber shell casing recovered from the living room in apartment 6. She said that the maximum distance for stippling was usually eighteen to twenty-four inches, meaning that a gun fired two feet from a victim could produce stippling on the victim.

Michael Stewart testified that he was the operations manager and keeper of records for Cricket Communications and identified the December 19, 2008 cellular telephone records for 643-xxxx, 503-xxxx, and 314-xxxx. Without objection from the defense, the State introduced the 643-xxxx records as those of Simmons's cell phone; the 503-xxxx records as those of Moore's cell phone; and the 314-xxxx records as those of Leavy's cell phone.[2]

Stewart testified that Simmons's records showed contact between his and Moore's phones at 12:22 a.m., 1:15 p.m, 1:30 p.m., 1:30 p.m., 1:35 p.m., 1:57 p.m., and 2:09 p.m. Stewart acknowledged that the "longest" call occurred at 1:15 p.m. for one minute, eighteen seconds. All of the calls after 1:15 p.m. were incoming calls and of very short duration, seven seconds or less. Moore's phone records showed the same calls between the two phones. Moore's records also showed contact between his and Leavy's phones at 10:11 a.m., 10:11 a.m., 10:12 a.m., 10:15 a.m., 10:16 a.m., 10:39 a.m., 12:20 p.m., 1:30 p.m., 1:38 p.m., 1:41 p.m., and 1:42 p.m. The longest call occurred at 1:38 p.m. for two minutes, twenty-nine seconds. Leavy's phone records showed the same calls between his and Moore's phones. Leavy's records also showed contact between his phone and a phone with number 273-xxxx at 10:41 a.m., 10:50 a.m., 11:10 a.m., 11:39 a.m., 12:17 p.m., 12:37 p.m., and 12:40 p.m. There was no contact between the two phones again until 4:25 p.m. Additional contact occurred at 5:32 p.m., 8:09 p.m., 8:11 p.m., 8:20 p.m., and 8:21 p.m.

On cross-examination, Stewart acknowledged that he could not determine from the records whether the callers actually spoke to anyone. At the conclusion of Stewart's testimony, the State rested its case-in-chief.

Twenty-two-year-old Courtneka Martin testified that in December 2008, she and Leavy had one daughter, and Martin was pregnant with their son. Martin and Leavy lived together, and Martin had a 2002 green Saturn that she let Leavy drive. Leavy was good friends with Lotto and Jo-Jo. Leavy and the appellant also were friends, but Martin did not know Leavy to "hang out" with the appellant. Leavy did not have a cellular telephone, so Martin would call Lotto's or Jo-Jo's phones when she wanted get in touch with him. Martin said Lotto's number was 314-xxxx, and she identified Jo-Jo's number as 463-xxxx.

---

[2]According to the records, the name on the account for 643-xxxx was Erica Thomas; for 503-xxxx was Jonathan Mulls; and for 314-xxxx was "unknown."

Martin testified that she awoke on December 19, 2008, about 8:00 a.m. and that Leavy was at home. Martin went back to sleep and awoke at 11:00 a.m., but Leavy was gone. She tried to contact him between noon and 1:00 p.m. by calling Jo-Jo's or Lotto's phone but was unable to speak with him. Leavy returned home just before 2:00 p.m. and stayed with their daughter while Martin left to meet her mother. Martin returned home about 5:00 p.m., and she and Leavy went to a Sonic Drive-In to get something to eat. Sometime that night, the police arrested Leavy. Defense counsel showed Martin the cellular telephone records introduced by the State as Leavy's phone records, and Martin identified five calls made from her phone to 314-xxxx on the night of December 19. The first call occurred at 10:36 p.m., and the five calls occurred over a span of about five minutes. Defense counsel asked why she was calling 314-xxxx, and she said the appellant was in jail and had her "three-way that number." She said she had placed calls to 314-xxxx earlier that day because she was trying to contact Leavy through Lotto.

Martin testified that the next day, she went to the police department and gave an interview. Leavy had told the police that he was with Martin all day on December 19, but Martin told them Leavy was not with her all day. Martin testified that to her knowledge, she had never been to the Essex House Apartments. She did not know if Leavy had been there. She acknowledged that Leavy had been incarcerated for "quite some time," that she was the single mother of two children, and that Lotto had helped her financially while Leavy was in confinement. She said that in 2008, Lotto did not have a job and drove a "white long car." Martin never heard Leavy say he was afraid of the appellant, and Martin never saw Leavy with a gun. However, after Leavy was charged in this case, he was released on bond. Later, the police supposedly found a gun on his person when they re-arrested him. Martin said she no longer had regular contact with Leavy and last saw him the Friday before trial.

On cross-examination, Martin testified that she did not know Leavy was dealing drugs "until this came about." She acknowledged that she may have given her statement to the police on January 3, 2009, not the day after the shooting. She said that she thought Leavy and the appellant were just friends and that she told the police she was afraid of the appellant.

On redirect examination, Martin testified that she was sure Leavy returned home before 2:00 p.m. on December 19. Defense counsel showed Martin the phone records for 314-xxxx again, and she acknowledged that the records showed contact between 314-xxxx, which was Lotto's phone, and 463-xxxx, which was Jo-Jo's phone, at 11:14 a.m. on December 19.

Christal Nelson testified that she dated the appellant in 2008 and 2009 and that the appellant would pick her up in a white Jeep. One time, Nelson saw Janice Williams's employment badge in the Jeep. Nelson said that on February 13, 2009, she and the appellant went to a nightclub. The next day, Valentine's Day, the appellant telephoned Nelson. Three

-13-

or four days later, Williams called Nelson from the appellant's cell phone and was screaming at Nelson. Williams called Nelson fifteen to twenty times, but Nelson did not answer her phone.

On cross-examination, Nelson testified that she did "[n]ot really" know the appellant was dating or living with Williams. She acknowledged that Williams sounded mad during the calls but that she did not feel threatened by Williams.

Antonio Moore was recalled by the defense and testified that on December 19, 2008, he first spoke with Mario Leavy between 10:00 and 11:00 a.m. Moore arrived at the apartment complex about 1:15 p.m. After Claiborne Jefferson told him what had happened, he left. On cross-examination, Moore acknowledged that he had identified 314-xxxx as Leavy's cell phone number. He said that Leavy called him from that number and that Leavy answered when he called that number. He said he was aware of Leavy's friendship with Lotto but did not know Lotto let Leavy use Lotto's phone.

Latoya Palmer testified that she began dating the appellant "seriously" in early 2009. On Valentine's Day, the appellant took her to dinner and a nightclub, and she spent the night with him. The next day, Palmer went to work but "met up" with the appellant about 4:00 p.m. She said that she knew Janice Williams and that she had had a confrontation with Williams over the appellant.

Seventeen-year-old Antwanika Pegues testified that she was thirteen years old in 2008, lived in the Essex House Apartments, and could see apartment 6 from her apartment "a little bit." On December 19, Pegues was home alone when she heard gunshots. She looked out the window, saw smoke, and saw some men run out of the apartment and to a white, four-door car. The car drove off, and Pegues did not get a good look at any of the men's faces. She said she had never seen the appellant before trial.

On cross-examination, Peagues testified that when she looked out the window, she saw smoke and "one person come down running [to] the car." The man was wearing a black mask, drove the car toward the complex exit, and stopped. Peagues said three or four more men came down to the car. The men got into the car, and the car drove away.

The appellant testified that in 2008, he and Leavy were "[a]ssociates through Lotto." The appellant had known both men his entire life but had a close relationship with Lotto, whose real name was Jason Upshaw. The appellant said that Lotto drove a white four-door Lincoln and had "his little thing he do" with drugs but that the appellant was "more into hanging with my girl or girls." Jo-Jo's phone number was 463-xxxx, and Lotto and Leavy shared the 314-xxxx phone. The appellant said the 314-xxxx phone was a "trap phone,"

-14-

meaning that it was a cheap phone a person could "put minutes on" and throw away. The appellant's phone number was 273-xxxx. However, Williams changed the number often because girls kept calling him.

The appellant testified that on December 19, he was "broke" and "living off Janice [Williams] and any female help." He said that he did not have any money to participate in the drug deal, that he did not kill Simmons, and that he was not present at the apartment. Days after Simmons's death, the appellant spoke with Jo-Jo on the telephone, and Jo-Jo told him what had happened. Jo-Jo also told the appellant about the shooting when the appellant and Christal Nelson were at the nightclub on February 13, 2009. Jo-Jo told the appellant that a white Lincoln had been driven to the apartment complex on December 19.

The appellant testified that in February 2009, he was seeing five women and that Williams knew he was cheating on her. The appellant spent the night of February 13 with Nelson and the night of February 14 with Latoya Palmer. He returned to Williams's home on the night of February 15. On the morning of February 16, Williams confronted him about where he had been and punched him in the face. The appellant said he grabbed Williams "out of instinct" and wrestled with her. The appellant carried a gun, a "38 revolver," and began looking for it so he could leave. In the process of looking for the weapon, he damaged some items in Williams's home because he was angry. Williams was on the telephone with her sister, and her sister heard the commotion. The police were called, but the appellant was never arrested. The appellant said that he and Williams used to argue every day but that the incident on February 16 was the first time he had hit her and that he had never put a gun to her head. The appellant said Williams had threatened to send him back to jail if he ever tried to leave her.

The appellant testified that after he was incarcerated for the gun charge mentioned by Williams during her cross-examination testimony, Williams never told him to stop calling her. In fact, Williams complained about his not calling her and "add[ed] minutes on the phone." Williams then learned that Palmer was pregnant and "got into it" with Palmer on the telephone. Afterward, Williams wrote a letter to the appellant, telling him that it was "payback time." The appellant had revealed to Williams what Jo-Jo had told him about Simmons's death. He said that on the night of December 19, he was not pacing back and forth, did not tell Williams to turn on the news, and did not speak with Lotto. He said that he did not even know what had happened in the apartment until Jo-Jo told him a couple of days later and that "the reason why I'm here today is because [Williams is] lying." He said he did not try to coerce or intimidate Williams regarding her testimony. He said that he did not know Antonio Moore, that he did not shoot Simmons or threaten to shoot Leavy, and that he had never been in a green Saturn.

-15-

On cross-examination, the appellant acknowledged that he was arrested in June 2009 and that he gave a statement to Lieutenant Leslie Curin. The appellant denied telling Lieutenant Curin that he spent most of December 2008 in Chicago or "down at the casinos." He said he told her that he was at Williams's home on the day of Simmons's death. Williams could not verify he was there, though, because Williams was at work. He said Williams changed his cell phone number about once per week.

The appellant acknowledged that on November 28, 2008, he was driving Williams's white Patriot and that the vehicle "got shot up." He said a girl's boyfriend shot the Patriot. The appellant denied beating Williams or ransacking her house and said, "I treat all of my women good." During their relationship, the appellant lived in Williams's home, drove her car, and used her money to gamble in Tunica. He said he won at gambling a "majority of the time" and bought her fancy jewelry and clothes. The appellant said that on February 16, 2009, he overturned a couple of pieces of Williams's furniture while he was looking for his gun but that he "paid for them." The appellant left Williams's home on February 16 but returned a couple of nights later. Williams advised the appellant that her sister had told the police that the appellant may have been involved in a murder unrelated to this case. The appellant later learned from Leavy that Williams had talked to the police about this case. The appellant said Williams "took . . . some of the stuff that I told her Jo-Jo told me and just added me in there." He said he thought Jo-Jo told him about what happened on December 19 because Jo-Jo "feel comfortable with me for some reason." He said he was not surprised that Leavy's girlfriend was afraid of him because "Mario probably done told that girl anything."

On redirect examination, the appellant testified that when he spoke to Williams from jail, he thought prosecutors were pressuring her. He said he was trying to help Williams and give her legal advice. He said he told Lieutenant Curin that he was not involved in Simmons's death and that Jo-Jo told him about it. At the conclusion of the appellant's testimony, the defense rested its case.

Lieutenant Leslie Curin of the MPD testified on rebuttal that she interviewed the appellant on June 5, 2009. The appellant claimed that Jo-Jo had told him about the crimes. Lieutenant Curin asked the appellant if the appellant was involved, and the appellant said no. Lieutenant Curin said the appellant told her that he was in Chicago "or at the casino because he was a professional gambler." The appellant did not claim he was at Williams's home. On cross-examination, Lieutenant Curin testified that she was not the coordinator for this case and that she did not investigate the appellant's claims.

At the conclusion of Lieutenant Curin's testimony, the State rested its case, and the jury convicted the appellant of conspiracy to possess with intent to sell more than 300 grams of cocaine, a Class A felony, and attempt to possess more than 300 grams of cocaine with

intent to sell, a Class B felony. The jury acquitted him of second degree murder, aggravated arson, and employing a firearm during the commission of a dangerous felony. After a sentencing hearing, the trial court sentenced him to forty years for conspiracy to possess cocaine and twenty years for attempting to possess cocaine and ordered that he serve the sentences consecutively for a total effective sentence of sixty years.

## II. Analysis

### A. Accomplice Instruction

The appellant contends that the trial court erred by failing to give an accomplice instruction for Antonio Moore because Moore "could have been convicted of both drug counts charged in the indictment and thus, clearly was an accomplice." The State argues that the appellant has waived the issue because he failed to request the instruction and that, in any event, any error was harmless. We conclude that the trial court did not err by failing to give the instruction.

At the conclusion of the appellant's case, the trial court advised the parties that it was going to give an accomplice instruction with regard to Mario Leavy and asked, "Anything else?" The defense did not request an accomplice instruction for Antonio Moore. During the charge, the trial court instructed the jury that Leavy was an accomplice and that accomplice testimony had to be corroborated.

A defendant has a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Accordingly, trial courts "should give a requested instruction if it is supported by the evidence, embodies a party's theory, and is a correct statement of the law." State v. Phipps, 883 S.W.2d 138, 150 n.20 (Tenn. Crim. App.1994). "An accomplice is one who knowingly, voluntarily, and with common intent participates with the principal offender in the commission of a crime." State v. Bough, 152 S.W.3d 453, 464 (Tenn. 2004) (citing State v. Lewis, 36 S.W.3d 88, 94 (Tenn. Crim. App. 2000); Conner v. State, 531 S.W.2d 119, 123 (Tenn. Crim. App. 1975)). "[T]he test for whether a witness is an accomplice is whether the witness could have been convicted of the offense." Id.

In this case, there was no proof that Moore conspired to possess cocaine with the appellant, Leavy, and Jo-Jo or that he attempted to possess cocaine with them. To the contrary, the State's witnesses, including Moore himself, testified that Moore already possessed the cocaine and that he and the victim planned to sell it to Leavy, Jo-Jo, and the appellant. Therefore, the accomplice instruction was not applicable to Moore, and the trial court did not err by failing to give the instruction. In any event, the appellant has waived the

issue because he failed to request the instruction.  Id. at 465.

## B.  Sufficiency of the Evidence

In a related argument, the appellant claims that the evidence is insufficient to support the convictions because the only two witnesses to testify about the drug deal were Moore and Leavy, accomplices whose testimony was uncorroborated.  The State argues that the evidence is sufficient.  We have already determined that Moore was not an accomplice.  Therefore, his testimony did not require corroboration, and we will only address whether Leavy's testimony was sufficiently corroborated.

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings.  See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).  The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt.  See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).  The State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom.  See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983).  In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts.  See State v. Pruett, 788 S.W.2d 559. 561 (Tenn. 1990).

The appellant is correct in that "a conviction may not be based solely upon the uncorroborated testimony of an accomplice."  State v. Stout, 46 S.W.3d 689, 696 (Tenn. 2001), superseded by statute on other grounds as stated in State v. Odom, 137 S.W.3d 572, 580-81 (Tenn. 2004).  As our supreme court has explained,

> There must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity.  This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.  The corroboration need not be

conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration.

State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994) (quoting State v. Gaylor, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992)) (brackets omitted), superseded by statute on other grounds as stated in Odom, 137 S.W.3d at 580-81. "Whether sufficient corroboration exists is a determination for the jury." State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001).

Although the jury acquitted the appellant of second degree murder, aggravated arson, and employing a firearm during the commission of a dangerous felony, the jury concluded that he conspired to possess cocaine and that he attempted to possess cocaine with intent to sell. The appellant claimed that he was not at the apartment on December 19, 2008. However, Leavy testified that he picked up the appellant and Jo-Jo and that they went to the apartment to buy one-half of a "key" from Simmons and Moore. Deijanea Cummings testified that the shooting in apartment 6 occurred on the afternoon of December 19, Officer Tate testified that he responded to the shots fired call at 1:40 p.m., and Courtneka Martin testified that Leavy returned to their home about 2:00 p.m. The State introduced into evidence Leavy's cell phone records, and the records showed contact between Leavy's and the appellant's phones numerous times on the morning of December 19. However, the contact inexplicably stopped at 12:40 p.m., near the time of the shooting and fire, and did not resume until 4:25 p.m. We conclude that Leavy's testimony was sufficiently corroborated so that the evidence is sufficient to support the appellant's convictions for conspiracy to possess with intent to sell more than 300 grams of cocaine and attempt to possess more than 300 grams of cocaine with intent to sell.

In any event, Leavy's testimony was not the only evidence against the appellant. Janice Williams testified that on December 19, the appellant confessed to her that he and some other men were supposed to be "splitting a key," that they went to an apartment to buy the drugs, and that the "drug deal had went bad." The next day, the appellant had Williams change his cellular telephone number. Therefore, the evidence is sufficient to support the convictions.

C.  Other Bad Act Testimony

Next, the appellant contends that the trial court erred by allowing Janice Williams to testify about the domestic violence incident that occurred on February 16, 2009, arguing that the trial court made no finding that the incident occurred by clear and convincing evidence and that the trial court allowed the testimony to rebut comments made by defense counsel during her opening statement, not based on evidence elicited during the actual proof. The

State argues that the trial court properly allowed the testimony. We conclude that the trial court erred but that the error was harmless.

During her opening statement, defense counsel said, "There is absolutely nothing like a woman scorned. Ain't nothing like it. This case is about just that." She noted that no physical evidence linked the appellant to the apartment and stated,

> This Janice Williams the State says, yeah, she was his girlfriend but you're also going to hear from another girlfriend at the same time. And you're going to hear testimony that those girlfriends got into it over Mr. Collins. One being late thirties, early forties. Mr. Collins at the time being in his twenties. And this other girlfriend in her twenties.
>
> And you're going to hear testimony that everything that happened happened in December of 2008 but this Janice Williams girlfriend, that person, that woman scorn[ed], never comes to the police. Never feels an obligation to even tell this story that somehow puts Mr. Collins in the story until August of 2009. How many months is that past? Eight nearly. That's what you're going to hear.
>
> You're also going to hear testimony from the other girlfriend that there was an ultimatum that Ms. Williams gave Mr. Collins. Do you want her or do you want me? And that he made a choice. He wanted her. And conveniently within a matter of days, less than you can count on your hand, she goes waltzing down to MPD, oh, I got something to tell y'all. Let me tell y'all about my boyfriend and here she goes. And she gives an account. But the fact, one fact she left out, the one fact that she left out, proof will show you what that is, please pay attention. You will hear it for yourself.
>
> . . . .
>
> But it's going to boil down to exactly what [the State] told you, credibility. Do you believe Mario and do you believe Janice.

Prior to Williams's taking the stand, the State asked that it be allowed to question her about the domestic assault, arguing that defense counsel had opened the door "as to why

Janice Williams and how Janice Williams came into contact with the police and gave her statement to the police about what Mr. Collins told her." The State argued that defense counsel had misled the jury and, therefore, that Williams should be allowed to testify that she gave her first statement as a result of the domestic violence incident in which the appellant beat her and ransacked her house. Defense counsel opposed the testimony because it would be highly inflammatory and because the appellant was never convicted of a crime. The trial court asked if the appellant had been charged or arrested. The State advised the court that the appellant had been charged, and the appellant interjected, "No, I wasn't. . . . A warrant was was struck out for me." The State then advised the court that it did not know if the appellant had been charged and that it did not have a police report for the incident. The trial court asked the State if there was any reason it "had to get into" the appellant's beating Williams and ransacking her house, and the State said it could limit her testimony but that "it needs to be clear . . . Mr. Collins was the perpetrator, the alleged perpetrator in this and, you know, Ms. Williams is the victim."

The trial court ruled that the State could question Williams about the incident, stating that

> there is a perception out there now in the eyes of the jury that the only reason this woman came forward and ever talked to the police is because she got into an argument with another girlfriend and got, and got angry and came down and told the police all this information. That's not the case if in fact the proof is after a domestic disturbance with Mr. Collins and the police talked to her about that, she says, by the way, he told me he killed somebody, that's a whole lot different. A whole lot different. And I do think the State has a right to put that proof in.
>
> . . . .
>
> I think that's very material and very relevant in light of opening statements, so. I would like to have it framed in a fashion that . . . did the police respond to a domestic disturbance where you were the victim and Mr. Collins . . . was the alleged perpetrator, now and leave it at that, you know. If in fact he was never charged and she knows that, you know, I'll leave it up to you to whether you want to introduce that or let [defense counsel]. But I'm going to let [defense counsel] explore that.

During Williams's direct testimony, the State asked if the police came to her home on

February 16, 2009, and she answered yes. The State also asked if her sister had called the police after Williams had reported to her sister that she had been the victim of a domestic assault at the "hands" of the appellant, and Williams again answered yes. Williams testified about giving her statement to the police but did not say anything further about the domestic assault. On cross-examination, Williams revealed to the jury that while she and her sister were talking on the telephone, her sister heard the appellant threaten her. Williams testified that she "pressed charges" but that the appellant was never arrested and that they never went to court.

Our supreme court has stated that, generally, "questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this Court will not interfere in the absence of abuse appearing on the face of the record." Pylant v. State, 263 S.W.3d 854, 870 (Tenn. 2008). Tennessee Rule of Evidence 404(b) provides that evidence "of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Furthermore, because opening statements by counsel are not evidence, such statements will not alone "open the door" for the prosecution to introduce evidence of other crimes. State v. Nicholas Todd Hilt, No. E2007-00546-CCA-R3-CD, 2009 Tenn. Crim. App. LEXIS 392, at *46 (Knoxville, Jan. 7, 2009) (citing State v. Kevin Rudd, No. W2005-02814-CCA-R3-CD, 2007 Tenn. Crim. App. LEXIS 725, at **16-17 (Jackson, Sept. 13, 2007)). In other words, opening statements by one party "simply provide nothing for the [other party] to rebut." State v. Nathan McKissack, No. 01C01-9804-CC-00190, 1999 Tenn. Crim. App. LEXIS 149, at *19 (Nashville, Feb. 19, 1999). Thus, the trial court erred by ruling that defense counsel had "opened the door" to direct testimony about the domestic assault.

However, the trial court limited the State's questioning of Williams so that Williams only testified on direct examination that she had been the victim of a domestic assault by the appellant. She did not elaborate on the incident. On cross-examination, Williams testified that her sister heard the appellant threaten her, and she acknowledged that her sister did not see the incident and that the appellant never went to court. We note that at the conclusion of Williams's direct examination testimony, the trial court instructed the jury that her allegations of other bad acts "are simply being admitted as to how you want to weigh her testimony but you are not to use them in any form or fashion against Mr. Collins in deciding whether he's guilty of not guilty of the events that we are trying today." We generally presume that a jury has followed the trial court's instructions. See State v. Butler, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994). We also note that prior to questioning Williams about the domestic assault, defense counsel elicited from her that she was afraid of the appellant, that he became violent in 2008, and that she failed to contact the police on December 20 because he had beaten her and put a gun to her head previously. Therefore, we conclude that the trial court's error was harmless. See Tenn. R. App. P. 36(b).

## D. False Testimony

The appellant contends that he is entitled to a new trial because his conviction was based, in part, on Mario Leavy's false testimony. The State argues that the appellant is not entitled to relief because he cannot show that Leavy gave false testimony at trial, specifically that Lotto participated in the crime; that the State knew the testimony was false; or that, even if Leavy lied about Lotto's participation, the testimony was material or deprived him of a fair trial. We agree with the State that the appellant is not entitled to relief.

The appellant was represented by new counsel for his motion for new trial. At the hearing on the motion, Rhonda Hooks testified for the appellant that she represented him at trial. She said that after Antwanika Pegues testified, she heard one of the prosecutors, Ray Lepone, say that "those eight years are off the table." Hooks said that she had "no idea" what he was talking about. She acknowledged that the State had not made an eight-year offer to the appellant, and new counsel asked her, "[S]o who could he [have] been talking about other than Mario Leavy?" Hooks answered, "You're asking me to speculate on something that I will not do." She denied telling new counsel that she thought the prosecutor was referring to Leavy and stated, "I never said to you then nor now that that's who he referenced. I told you specifically what that utterance was then and now." Hooks said she never became aware that the prosecution had learned Leavy testified falsely.

New counsel called Mario Leavy to the stand. However, Leavy refused to testify, invoking his Fifth Amendment right against compulsory self-incrimination.

Assistant District Attorney General Paul Hagerman testified for the appellant that he and Assistant District Attorney General Paul Lepone prosecuted the appellant. General Hagerman acknowledged that he spoke with Leavy prior to Leavy's testifying at trial and said that Leavy never indicated Lotto participated in the crime. He said that he never became aware after trial that Leavy had testified falsely but that "I think we all had our suspicions, me, Mr. Lepone, the defense attorneys, the jurors, everybody, that Lotto may have been involved but we never had any proof of that." He said that if he had learned Leavy testified falsely, he would have notified "defense counsel, the judge, everybody." He said that Leavy "absolutely did not" have an agreement with the State, that Leavy was to testify truthfully, and that "at that point we'd take his truthful testimony in consideration." General Hagerman refused to speculate as to why Leavy had invoked his Fifth Amendment right at the hearing.

Assistant District Attorney General Ray Lepone testified that he also prosecuted the appellant at trial. He met with Leavy several times before trial, and Leavy's lawyer, Ross Sampson, was present during the meetings. He said that, at some point, Sampson "became conflicted out" and withdrew as Leavy's attorney. General Lepone said he did not offer a plea

deal to Leavy. However, he said, "We tell every witness, every cooperating witness that if they testify truthfully that they can expect consideration for that testimony." General Lepone said that Leavy "guaranteed us that Jason Upshaw, Lotto, was not there, we believed him. And so at that point we moved forward with putting him on the witness stand." General Lepone then stated that "I never to this day know whether or not Lotto was there or not. If you're asking me if I got upset when I saw some possible evidence there may have been a fourth person there, I don't know if it's Lotto, absolutely." General Lepone said that he did not suspect Leavy testified falsely but that "there was evidence presented that the Court heard, the jury heard, that the little girl saw a fourth person there." He said that Antwanika Pegues "could have been mistaken" about a fourth person and that "[we just found that fact very interesting during the trial as I'm sure the jury did."

General Lepone testified that during the trial, he and General Hagerman began to suspect more people were involved than just the people named. Therefore, General Lepone sent a text message to Rhonda Hooks, advising her that "if [the appellant] had cooperating information of people that were not named in the trial that we might want to look at that before his sentencing." However, the prosecutors changed their minds and decided not to speak with the appellant because "he's a liar. He's lied hundreds of times. . . . So we decided we were not going to move forward with that. So I told Ms. Hooks we do not need to speak to Mr. Collins." General Lepone said the appellant later contacted, against his attorney's advice, a homicide detective and "confessed to being in the crime and then began to implicate two attorneys as well."

Upon being questioned by the trial court, General Lepone testified that he never heard Leavy admit to lying at trial but that "I believe his attorney said that now he wants to say Lotto was there after the fact." He stated that "all these witnesses keep adding facts, taking facts away, [so] we never had any proof during the trial that Lotto was there" and that "as we sit here today the State can't tell you whether or not Lotto was present or not or whether or not Mario Leavy actually lied at the trial."

The trial court found that it had no proof Leavy gave false testimony at trial, stating that "everybody suspects that it was false but there's no proof that it was false." Regarding the materiality of Lotto's being present during the crimes, the trial court stated,

> I'm still not sure that I find how that would be material to the fact of who was involved in the conspiracy to purchase the drugs. There's nothing that was indicated in the trial, that I recall, that Lotto or Mr. Upshaw was purchasing drugs or was a part of the conspiracy.

-24-

I fail to see how that fact whether he was present or whether he was not present would alter the verdict of the jury based upon the proof that we've heard. There was nothing that indicated that anything other than the three people who were present inside that apartment, three or four people that were present inside that apartment were there to buy drugs. I mean, that was the -- that part of the proof was consistent from everybody. And so I don't think whether or not people speculate that Lotto, Mr. Upshaw, was present or not present would have effected or changed the verdict of this jury.

As our supreme court has explained,

The test for granting a new trial in cases involving recanted testimony as newly discovered evidence is based on the following criteria: A new trial may be granted because of recanted testimony when (1) the trial judge is reasonably well-satisfied that the testimony given by a material witness was false and that the new testimony is true; (2) the defendant was reasonably diligent in discovering the new evidence, was surprised by false testimony, or was unable to know of the falsity until after the trial; and (3) the jury might have reached a different conclusion had the truth been told. State v. Hostler, 193 S.W.3d 476, 494 (Tenn. 2006) (citing State v. Dixon, 983 S.W.2d 661, 666 (Tenn. 1999)).

State v. Crows, No. M2009-02194-CCA-R3-CD, 2010 Tenn. Crim. App. LEXIS 591, at *22-23 (Nashville, July 16, 2010). "The decision as to whether to grant a motion for new trial on the basis of newly discovered evidence lies within the sound discretion of the trial court." Id. at *23.

Initially, we note that Leavy refused to testify at the motion for new trial hearing and has never recanted his testimony. In any event, the first and third prongs of the test have not been satisfied because the trial court was not reasonably well-satisfied that Leavy's testimony was false or that the jury might have reached a different conclusion if Leavy had testified that Lotto was present during the crimes. We agree with the trial court. None of the trial attorneys involved in the case could say that Leavy's testimony was false. Furthermore, even if Lotto was present at the apartment on December 19, his presence did not exculpate the appellant from being involved in the drug deal. The jury heard Pegues's testimony that she saw three or four men run to the car after the driver, and the jury's decision to acquit the appellant of

-25-

second degree murder, aggravated arson, and employing a firearm during the commission of a dangerous felony convinces us that it carefully considered the evidence in this case. Therefore, we agree with the trial court that the appellant is not entitled to relief on this issue.

### E. Consecutive Sentencing

Finally, the appellant contends that consecutive sentencing was improper because the trial court made insufficient findings regarding the Wilkerson factors. The State argues that the trial court correctly ordered consecutive sentencing. We agree with the State.

At the appellant's April 4, 2012 sentencing hearing, Sergeant Mundy Quinn of the MPD testified for the State that sometime in March 2012, the appellant asked to speak to someone in the Homicide Bureau. Sergeant Quinn had been looking for Jo-Jo, whose real name was Quinton Leaverson. On March 17, the appellant was brought to the Bureau and spoke with Sergeant Quinn. He told the officer that he had information about two homicides. Specifically, he told Sergeant Quinn that Jo-Jo and a woman named Latrisha or Latrice Jones were dead and that Lotto had told the appellant that Lotto killed them. Sergeant Quinn asked why Lotto had told him about the killings, and the appellant said, "[B]ecause Ross Sampson and Tyrone Paylor who is Lotto's uncle is an attorney and that they told them that Jo-Jo would not hold up and that the female overheard them talking about a homicide and that's why he was -- they were killed." The appellant also told Sergeant Quinn about Simmons's death, stating that he and Lotto went to apartment 6 to check on Leavy and Jo-Jo, that Jo-Jo panicked and started fighting with Simmons over the gun, and that the appellant shot Simmons. The appellant told the officer that Simmons "was still moving," so the appellant walked over to Simmons and shot him again. The appellant then cleaned up and set fire to the apartment and Simmons. Sergeant Quinn acknowledged that, based on what the appellant told him, most of Leavy's trial testimony was true.

On cross-examination, Sergeant Quinn testified that he was the coordinator for this case but did not testify at trial. Sergeant Quinn was not present in the courtroom during the trial and did not hear any of the witnesses' testimony. He obtained his information about the case from the investigation. The appellant's March 17 interview was not recorded. Sergeant Quinn said that he never found a missing person report for Jo-Jo or Jones and that he was no longer looking for Jo-Jo because he did not have enough evidence to charge Jo-Jo with a crime. Sergeant Quinn did not investigate the appellant's claim regarding Sampson and Paylor.

The appellant gave a statement in his own behalf, stating that he had made a lot of wrong decisions but that he had never harmed an innocent person. He stated that his attitude was "cocky" but that people did not understand "the logic behind it" and that "I'm so

misunderstood I get put into a category where I'm a monster." He said that he had accepted responsibility for his past crimes but that he did not commit the crimes in this case. He stated that his codefendant and Williams lied at trial, that he did not want to be in prison forever, and that "by God's grace I'm going to get out."

The State introduced the appellant's presentence report into evidence. According to the report, the then twenty-seven-year-old appellant was single with one daughter, whom he had never met. In the report, the appellant stated that he dropped out of school after completing the seventh grade, that he earned his GED while in federal prison, and that he had never been affiliated with a gang. The appellant reported that he had no health problems but that he began using crack cocaine when he was eleven years old and methamphetamine and marijuana two years later. He stated that his drug use "evolved to using whatever he could get every day." The appellant stated that he worked for McEwin's restaurant in 1999, and the preparer of the report verified his employment. The appellant reported no other employment. The report showed that the appellant had four prior convictions of simple assault, two prior convictions of harassment, two prior convictions of misdemeanor vandalism, and single convictions of felony aggravated assault, felony possession of drugs, and joyriding. The appellant also had a federal conviction of being a felon in possession of a firearm. The State submitted documentation to the trial court, showing that in 2000, the appellant was adjudicated delinquent of aggravated robbery, aggravated burglary, and burglary.

The trial court applied enhancement factor (1), that "[t]he defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range," and gave the factor great weight. Tenn. Code Ann. § 40-35-114(1). The trial court also applied enhancement factors (5), that "[t]he defendant treated, or allowed a victim to be treated, with exceptional cruelty during the commission of the offense," and (6), that "[t]he personal injuries inflicted upon . . . the victim was particularly great," stating that although the jury acquitted the appellant of killing Simmons, "the victim in this case died as a result of the actions of the conspirators." Tenn. Code Ann. § 40-35-114(5), (6). The trial court applied enhancement factor (9), that the defendant possessed or employed a firearm during the offense, finding that "[the jury] found that he was a part of the conspiracy and a firearm was used in the death of the victim . . . and again arguing criminal responsibility I think Mr. Collins could be held accountable for that." See Tenn. Code Ann. § 40-35-114(9). Finally, the trial court applied factors (10), that "[t]he defendant had no hesitation about committing a crime when the risk to human life was high," noting that a family lived next door to the location of the drug deal; (12), that "[d]uring the commission of the felony, . . . the actions of the defendant resulted in the death of . . . a victim . . . other than the intended victim"; and (16), that "[t]he defendant was adjudicated to have committed a delinquent act or act as a juvenile that would constitute a felony if committed by an adult." Tenn. Code Ann. § 40-35-114(10), (12), (16). The court applied no mitigating factors.

The trial court noted that the appellant was a Range II, multiple offender and sentenced him to forty years for conspiracy to possess with intent to sell more than 300 grams of cocaine and twenty years for attempt to possess more than 300 grams of cocaine with intent to sell, the maximum sentences in the range for Class A and B felonies. See Tenn. Code Ann. § 40-35-112(b)(1), (2).

Regarding consecutive sentencing, the trial court considered the appellant's admission to Sergeant Quinn about his role in Simmons's death and setting the fire. The trial court found the appellant to be "a dangerous offender whose behavior indicates little or no regard to human life and no hesitation about committing a crime in which the risk to human life was high." Tenn. Code Ann. § 40-35-115(b)(4). The trial court stated that the "circumstances surrounding this offense are very aggravated. Somebody died and the apartment was caught on fire. Innocent people were put at risk." The trial court also stated that society needed to be protected from the appellant because he "has an unwillingness to lead a productive life" and because "he's been involved in the criminal justice system, by his own statement, for you know, twenty years." The trial court also applied consecutive sentencing on the basis of the appellant's extensive criminal history. See Tenn. Code Ann. § 40-35-115(b)(2).

"[S]entences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). Furthermore, "the appropriate standard of appellate review for consecutive sentencing is abuse of discretion accompanied by a presumption of reasonableness." State v. James Allen Pollard, ___ S.W.3d ___, No. M2011-00332-SC-R11-CD, 2013 Tenn. LEXIS 1011, at **19-20 (Nashville, Dec. 20, 2013). In conducting its review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general

assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. "[A]ppellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence." Id. at 345-46. "[They are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

Although not raised by the appellant, we note that the jury's acquitting him of second degree murder and employing a firearm during the commission of a dangerous felony precluded the trial court's application of enhancement factors (5), (6), and (12) regarding the victim's death and factor (9) regarding the possession of a firearm. Nevertheless, the trial court properly applied enhancement factor (1) for the appellant's previous convictions, factor (10) for his having no hesitation about committing a crime when the risk to human life was high, and factor (16) for his being adjudicated delinquent as a juvenile for acts that would constitute a felony as an adult. The trial court's proper application of three enhancement factors, one of which the trial court gave great weight, justified the forty- and twenty-year sentences.

As to consecutive sentencing, the trial court found that the appellant's extensive criminal history justified consecutive sentencing. We agree, and that factor alone justifies consecutive sentencing. In any event, the trial court also found the appellant to be a dangerous offender. Our case law clearly reflects that in order to impose consecutive sentencing based upon finding that a defendant is a dangerous offender, a court must also find that "(1) the sentences are necessary in order to protect the public from further misconduct by

-29-

the defendant and [that] (2) 'the terms are reasonably related to the severity of the offenses.'" State v. Moore, 942 S.W.2d 570, 574 (Tenn. Crim. App. 1996) (quoting State v. Wilkerson, 905 S.W.2d 933, 936, 938 (Tenn. 1995)); see also State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999).

In this case, the trial court specifically addressed the Wilkerson factors and found that consecutive sentencing was necessary to protect the public from the appellant and that consecutive sentencing reasonably related to the severity of the offenses because the circumstances surrounding the offenses were "very aggravated," someone died during the drug deal, the apartment was set on fire, and innocent people in the apartment building were put at risk. Therefore, we conclude that the trial court did not abuse its discretion by ordering consecutive sentencing based on the appellant's being a dangerous offender.

### III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we conclude that no reversible error exists in this case and affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE